In re HELIX ENERGY SOLUTIONS
GROUP, INC.

Helix Energy Solutions Group,
Inc., Appellant,

v.

Dyna Torque Technologies, Inc. and
Intec Engineering, L.P. n/k/a
Intecsea, Inc., Appellees.

Nos. 14–09–00202–CV, 14–09–00107–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 5, 2010.

J. Stephen Barrick, John Deis, Houston, TX, for relator.

John Joseph Hardig, Joseph Kelly Watts, Lewis W. Jost, Houston, TX, for real party in interest.

Panel consists of Justice BOYCE, and Senior Justice MIRABAL (Sitting by assignment).

## OPINION

WILLIAM J. BOYCE, Justice.

This is an interlocutory appeal (Cause Number 14–09–00107–CV) and petition for writ of mandamus (Cause Number 14–09–00202–CV). Appellant/relator Helix Energy Solutions Group, Inc. challenges the trial court's order denying its motion to stay and compel arbitration of claims brought by appellee/real party in interest Dyna Torque Technologies, Inc. against Helix and appellee/real party in interest

Intec Engineering, L.P. n/k/a INTECSEA, Inc. We consolidated these two proceedings. *See In re Valero Energy Corp.,* 968 S.W.2d 916, 916–17 (Tex.1998) (orig. proceeding) (per curiam). We conditionally grant the petition for writ of mandamus and dismiss the interlocutory appeal as moot.

## Background

Helix is located in Houston and provides various marine-based services, including construction and pipeline work, to the oil and gas industry. Helix BV is a division of Helix located in the Netherlands. Dyna Torque provides automated welding services for the pipeline construction industry and is located in Houston. INTECSEA provides project management services for deep water pipeline and subsea production out of Houston.

On November 8, 2006, Helix BV requested a quote from Dyna Torque to provide special welding equipment and services[1] to outfit its pipe-laying vessel *Caesar* in connection with construction of an offshore pipeline for Murphy Exploration & Production Company–USA ("Murphy") called the "Thunder Hawk" project. Dyna Torque submitted its original quote to Helix BV on November 15, 2006 for welding procedures development and qualifications in the amount of $1,173,900. The quote also stated: "Payment terms: 50% of procedure price in advance; balance due after delivery of qualified procedure; terms for production to be discussed, typically 15% of the value of the contract due at signing of contract with equipment being available 8–10 weeks after signing of the contract; remainder of the contract

value to be paid after system installation on board pipelay [sic] vessel."

According to Dyna Torque, Helix BV offered continuous assurances throughout late 2006 and early 2007 that the *Caesar* would be equipped with Dyna Torque's Lone Star Automated Welding System, and that a purchase order requesting Dyna Torque's services would be forthcoming. Dyna Torque employee Andrew Scherfenberg stated in his affidavit that Dyna Torque received a portion of Murphy's project specifications on March 29, 2007, which required onshore and offshore administrative facilities.

Dyna Torque employee Dejan Medanic stated in his affidavit that Helix BV employee Hans van Maris told him at an April 2, 2007 meeting that Helix had selected Dyna Torque's Lone Star Automated Welding System to outfit the *Caesar.* At that same meeting, van Maris asked Dyna Torque to "start working on the design of the welding trolleys where equipment will be installed." Medanic says he "immediately began working on the design of the trolley for use on the *Caesar.*" An April 5, 2007 e-mail reflects that Helix BV employee Rommel Heemskerk sent Dyna Torque specifications for the design of a welding trolley for the *Caesar.* On April 27, 2007, Heemskerk inquired by e-mail about the progress of the welding trolley design. Medanic replied on May 6, 2007, and asked Heemskerk for further specifications.

Medanic further states in his affidavit that by late May 2007 he was providing Helix with monthly progress reports on the design for installing Dyna Torque equipment on the *Caesar.* A May 30, 2007 e-mail entitled "CAESAR CONVER-

---

1. More specifically, Helix BV asked Dyna Torque to provide a quote for project management and engineering, welding procedure qualifications, welder qualifications, mobiliza-
tion and demobilization of personnel and equipment, dayrate for equipment, provision of consumables, provision of spares for equipment, and dayrate for personnel.

SION—MONTHLY ENGINEERING REPORTS FOR MAY—REMINDER" from Heemskerk addressed to Medanic and other recipients states: "May I remind you all of your Monthly report due for Friday coming (1st June) 12:00hrs. Make sure the narrative is accompanied with the usual schedule and progress updates in PDF and native format."

In May 2007, INTECSEA assigned its employee Ron Tomon to serve as the project manager for the upcoming Thunder Hawk project pursuant to an engineering and consulting services agreement INTECSEA and Helix signed on April 27, 2007. Tomon's duties included "managing, on Helix's behalf, the subcontractors' work, scheduling the work performed by the subcontractors, as well as monitoring the quality and safety of the work performed by the subcontractors ... hiring subcontractors and terminating subcontractors...."

In June 2007, Helix signed an agreement with Murphy to install offshore export pipelines and flowlines for Murphy's Thunder Hawk project.

Between June 28, 2007 and July 10, 2007, Scherfenberg and Medanic of Dyna Torque had three meetings with Tomon and Helix employee Robert van der Kooij "regarding Murphy administrative facilities, procedures development and consumables selection."[2] According to Dyna Torque, Helix and Tomon stalled on issuing a purchase order; Dyna Torque nonetheless "aided in the consumables selection process by recommending various welding wire for consumables selection welding and testing to determine if the same wire could be used for the Thunder Hawk" project

and other projects in which the *Caesar* was slated to participate. In early August 2007, Dyna Torque obtained tensile testing for welds used in consumables selection and procedures development at the request of INTECSEA project manager Tomon.

Dyna Torque's Scherfenberg states in his affidavit that he met with Tomon on August 8, 2007 "regarding payment terms, progress on the work related to consumables selection and procedures development for the projects." Scherfenberg also states that the minutes of the August meeting reflect discussions "regarding approval of our [Dyna Torque's] quote, payment terms, progress on the work related to consumables selection and procedures development for the projects."

On August 9, 2007, van der Kooij sent Scherfenberg an e-mail in which he inquired about welding procedure qualifications for Helix's "Noonan" project—another project for which the *Caesar* was slated. Van der Kooij states in an e-mail as follows: "Question for you: We need to qualify the procedures for this project. When is the earliest opportunity? We are thinking October? Can you please advise. As soon as I'm back in the [sic] Houston we have to sit together with our project manager Douglas Gorman to go through the project."

Scherfenberg further states in his affidavit that Dyna Torque "ordered more than 1.2M in equipment prior to August 21, 2007 for procedures development, welder qualification and training, double jointing, and for eventual use on the *Caesar* and for projects to which the *Caesar* would be slated."

---

2. The minutes of the June 28, 2007 meeting reflect the following "Record of Discussions": "DT [Dyna Torque] to provide Client [Murphy] office on site with normal office amenities." The July 6, 2007 meeting minutes reflect the following "Record of Discussions": "DT [Dyna Torque] confirmed that they will be setting up some kind of temporary offices and conference room for Murphy employees."

On August 21, 2007, Helix and Dyna Torque signed a Master Service Agreement (the "MSA") "for welding equipment, facilities and services to be provided by Dyna Torque to Helix."

The Master Service Agreement controls and governs "the performance of all work by ... [Dyna Torque] for Helix and/or Helix's Customer, given on or after the date hereof." The Master Service Agreement does not provide for the performance of any specific work for any specific price. Instead, it requires Helix to issue work orders to Dyna Torque; upon Dyna Torque's acceptance of the work orders, they become part of the Master Service Agreement:

III. WORK ORDERS TO BE PART OF THIS CONTRACT

This Contract does not obligate Helix to order works and/or equipment or materials from ... [Dyna Torque], nor does it obligate ... [Dyna Torque] to accept such orders, but it, together with any applicable work order which shall form a part hereof, shall control and govern all work accepted by ... [Dyna Torque] and shall define the rights and obligations of Helix and ... [Dyna Torque], during the term hereof. In the event of conflict, *this contract shall take precedence* over any work order, delivery ticket or any other document issued .... (emphasis in original).

The Master Service Agreement also includes an arbitration clause. It provides as follows:

XIII. DISPUTES—ARBITRATION

Any dispute arising under this Contract that is not settled by negotiation of the parties shall be settled in accordance with the provisions of Helix's Contract with its customer [Murphy] if the dispute affects the customer. In the absence of any such provisions and in cases in which the customer is not affected, any such dispute shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association before an arbitrator selected in accordance with such rule. It is the preference of the parties that all such arbitration be conducted in Houston, Texas.[3]

Dyna Torque contends there was an internal disagreement between Helix and Helix BV by October 2007 regarding the selection of Dyna Torque as the welding contractor, which "forced those against Dyna Torque to use any means necessary to force Dyna Torque to breach the contract." According to Dyna Torque, "Tomon attempted to rewrite history by ignoring the turnkey quote and informing Dyna Torque that he will 'pick and choose' items on Dyna Torque's quotation for approval. After reminding Mr. Tomon that Helix BV requested a turnkey, not a line item quote, Dyna Torque received a PO [Purchase Order] on October 17, 2007."

Helix employee Roy Sijthoff states in his affidavit that "Pursuant to Section III of the MSA, Helix issued Purchase Order 135392 (the "PO") to Dyna Torque for welding equipment to be installed on Helix's offshore services vessel, the *Caesar*. ... The PO also covered facilities and services to develop and test welding procedures and supplies, and training of Helix's personnel on the welding procedures." This purchase order in the amount of $1,009,350 was dated October 17, 2007 and stated, "ALL ITEMS PER DYNA TOR-

---

**3.** The Master Service Agreement does not delineate the terms of any dispute resolution "provisions of Helix's Contract with" Murphy. Dyna Torque does not contend that any "provisions" of the June 2007 Helix–Murphy contract should apply to the Dyna Torque—Helix dispute in place of the Master Service Agreement's arbitration clause.

QUE QUOTE NO. 111506–A–3 DATED 09/04/07." [4]

On October 30, 2007, Dyna Torque issued invoice number 1553 in the amount of $442,825.00. This amount represented a "50% Down Payment for PO# 135392, Job# 714823/Murphy—Balance of $885,250 after Credit of $124,100.00 DE Charges Quoted Total Amount PO# 135392 $1,009,350.00." Dyna Torque also issued invoice number 1567 in the amount of $125,144.00 on October 30, 2007 for

Consumables Selection: Days July 20, 21, 23, 24; Aug. 8; Sept. 7, 8, 9

Prepare Weld Nos. 1 through 8 (at the request of Robert van der Kooij)

Day Rate: Automatic Welding Equipment

Day Rate: Warehouse Facility Use

Laboratory and Testing Charges for consumable selection Welds 1 through 8

Training and Equipment Familiarization: Oct. 16 through Oct. 30

Helix Welders: Training and Equipment Familiarization

Day Rate: Automatic Welding Equipment

Day Rate: Warehouse Facility Use

Pipe Facing/Beveling Machine Services for Helix Welder Training: 10/15/07–10/19/07

Pipe Facing/Beveling Machine Services for Helix Welder Training: 10/22/07–10/26/07

Monthly Office Rental Charge—Pre–Contract for Sept.-Oct. 2007

According to Dyna Torque, Tomon sent Dyna Torque an e-mail on November 6, 2007 in which he stated that " 'he can not agree to pay 50% of the PO value up front for any contractor or services' [which is] in direct contradiction to statements he made on August 8, 2007 and the PO that was issued October 17, 2007." Tomon states in his affidavit that, after he spoke with Roy Sijthoff of Helix concerning Dyna Torque's lack of performance under the Master Service Agreement and with Sijthoff's consent, he "communicated Helix's termination of the Master Service Agreement to Dyna Torque in November of 2007."

Dyna Torque contends that Tomon called Scherfenberg on November 14, 2007 "to advise that Helix was pulling out and that Dyna Torque was to cease any further work. . . . Of course, this is in direct contradiction to Dyna Torque's contract with Helix and was an overt attempt to have Dyna Torque breach by non-performance under the contract." On November 18, 2007, Dyna Torque issued invoice number 1617 for $15,657.50. The invoice contained charges for the following:

WEEK OF 10/26/07—11/02/07

Warehouse Charges for consumable selection program by Robert and Helix Welders, allocated area and resources made available as required

Equipment Rental—TIG Unit (Equipment not rented in Murphy scope)

Beveling/Flame Cut charges per end

Dyna Torque Warehouse men helpers as required

WEEK OF 11/05/07—11/09/07

Warehouse Charges for consumable selection program by Robert and Helix Welders, allocated area and resources made available as required

Equipment Rental—TIG Unit (Equipment not rented in Murphy scope)

Beveling/Flame Cut charges per end

---

**4.** The record before this court does not contain Dyna Torque's Quote No. 111506–A–3 dated 09/04/07 referred to in the October 17, 2007 purchase order. The record contains only Dyna Torque Quote No. 111506–A and No. 111506–B dated November 15, 2006.

Dyna Torque Warehouse men helpers as required

WEEK OF 11/12/07—11/16/07

Warehouse Charges for consumable selection program by Robert and Helix Welders, allocated area and resources made available as required

Equipment Rental—TIG Unit (Equipment not rented in Murphy scope)

Beveling/Flame Cut charges per end

Dyna Torque Warehouse men helpers as required

Dyna Torque contends that Tomon drafted a termination e-mail letter on November 19, 2007 even though Helix was "still not in compliance with the Master Service Contract." Sijthoff states in his affidavit that "Helix and Dyna Torque were involved in a dispute over materials Dyna Torque held in possession that were owned by Helix or Murphy in connection with the Project. On January 4, 2008, Helix and Dyna Torque signed a letter agreement under which Helix made a payment on the account to Dyna Torque under the PO in the amount of $100,000." The January 4, 2008 agreement states in pertinent part as follows:

*Payment on the Account and Return of all Materials*

As confirmed in your phone conversation with Ron Tomon on January 2, pursuant to Purchase Order # 135392 (the "Purchase Order") under the Master Service Contract (the "Contract") . . . between Helix . . . and Dyna Torque . . . attached please find a check (the "Check") in the amount of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00) made payable to Dyna Torque.

By execution hereof, Dyna Torque acknowledges and agrees that

1. It has received this letter and the Check

2. The Check constitutes payment on the account under the Purchase Order and the Contract. . . .

\*　　\*　　\*

In order that Helix may make any payments which may be due and owing to Dyna Torque under the Contract, as we have previously instructed, please deliver invoices for all outstanding amounts which Dyna Torque believes it is owed, accompanied by proper supporting documentation for such amounts as required by the Contract. Any such amounts will be partially offset by the amount represented by the Check.

Execution of this letter by Dyna Torque shall not constitute a waiver of claims for amounts which Dyna Torque believes it is owed under the Contract but which are not covered by the Purchase Order.

On January 4, 2008, Dyna Torque issued invoice number 596 for $839,545.90. Although the invoice contained charges for preparatory costs incurred by Dyna Torque, most of the charges were for services rendered and items supplied by Dyna Torque pursuant to Purchase Order No. 135392 dated October 17, 2007. Sijthoff states in his affidavit that Helix notified Dyna Torque's counsel on February 1, 2008 that any dispute over payment of the invoices falls within the scope of the Master Service Agreement's arbitration provision, and that Dyna Torque's claims must be resolved by arbitration.

On October 1, 2008, Dyna Torque filed suit against Helix and INTECSEA asserting numerous claims.

First, Dyna Torque asserted a claim on a sworn account alleging that Helix and INTECSEA owed Dyna Torque $1,232,862.30 based on invoices numbered 1553, 1567, 1617, and 596 issued to Helix. Dyna Torque alleged that it sold Helix and INTECSEA goods and services at their

request; that the prices charged were "provided according to the terms of the MSA and PO and/or, in the alternative, the usual customary and reasonable prices;" that Helix and INTECSEA accepted the goods and services; and "became bound to pay Dyna Torque its designated charges."

Second, Dyna Torque asserted a claim for breach of contract. Dyna Torque alleged that it provided various quotes for goods and services; that Helix and INTECSEA accepted Dyna Torque's terms "for providing goods and services and for additional goods and services in addition to those originally quoted as well as those specifically listed under the quotes;" and that Helix and INTECSEA became bound to pay upon acceptance.

Third, Dyna Torque asserted an alternative claim for promissory estoppel against Helix and INTECSEA, claiming that "[e]ven if there lacks a promise to pay for certain goods and services provided by Dyna Torque ... [Helix and INTECSEA] are still liable to Dyna Torque for those goods and services as they were required to meet scheduling demands implied for providing goods and services requested by" Helix and INTECSEA.

Fourth, Dyna Torque asserted a claim for breach of the duty of good faith and fair dealing. Dyna Torque alleged that the "unique nature of the multiple stage contract imposed a duty of good faith and fair dealing" on Helix and INTECSEA; that Helix and INTECSEA breached that duty "by undermining Dyna Torque's ability to perform under the contract;" and that Helix and INTECSEA are liable for breaching their duty of good faith and fair dealing.

Fifth, Dyna Torque asserted a claim for breach of a "duty to cooperate." It alleges that "[c]ooperation was essential for suc-

cessful performance under the verbal requests for goods and services, the MSA and PO;" that Helix and INTECSEA had a duty not to interfere with Dyna Torque's performance; and that Helix and INTECSEA breached that duty "by interfering with Dyna Torque's ability to perform under the contract."

Sixth, Dyna Torque asserted a claim for fraud, alleging that Helix and INTECSEA made false representations "with the intent that Dyna Torque should act upon it [sic] by entering into the MSA and ordering, manufacturing and delivering equipment and materials, performing work listed and requested after the RFQ[5] and affecting significant modifications to Dyna Torque's premises;" that Dyna Torque "acted in reliance on the representations by entering into the MSA, ordering equipment and materials, performing work listed and requested after the original quote;" and that Dyna Torque suffered financial loss.

Seventh, Dyna Torque asserted a claim for tortious interference with contract, alleging that Dyna Torque had a valid contract with Helix BV, Helix and/or INTECSEA to provide equipment and services for consumables qualification and procedures development "through the MSA, PO, or requests for services;" that Helix BV, Helix and/or INTECSEA interfered with "one or more of these contracts;" and that this interference proximately caused Dyna Torque damages. Lastly, Dyna Torque requested attorney's fees and expenses pursuant to chapter 38 of the Texas Civil Practice and Remedies Code.

On October 31, 2008, Helix filed a motion to stay and compel arbitration under the Federal Arbitration Act and the Texas Arbitration Act. On November 25, 2008, INTECSEA filed a motion for partial sum-

---

**5.** "RFQ" apparently stands for "Request For Quote."

mary judgment. On December 12, 2008, Helix filed a supplemental brief in support of its motion to stay and compel arbitration.

INTECSEA filed its objection to Helix's motion to stay and compel arbitration on December 18, 2008, arguing that it cannot be compelled to arbitrate because it was not a signatory to "the underlying Master Service Agreement or the arbitration clause contained therein." INTECSEA alternatively asked the trial court to stay proceedings between Dyna Torque and INTECSEA until the arbitration between Dyna Torque and Helix is concluded.[6]

Dyna Torque also filed its objection to Helix's motion to stay and compel arbitration on December 18, 2008. Dyna Torque contended that Helix failed to establish that the claims asserted by Dyna Torque are within the arbitration agreement's scope because Helix did not satisfy the conditions precedent to triggering arbitration. According to Dyna Torque, as a condition precedent to arbitration Helix had to establish that Dyna Torque's claims affected Helix's customer Murphy. Dyna Torque also contended that its claims are not subject to arbitration because "the work was given prior to the parties entering into the MSA."

The trial court signed an order on December 29, 2008, denying Helix's motion to stay and compel arbitration concluding "that movant has not satisfied its burden."

**. Analysis**

Helix contends that the trial court abused its discretion by denying its motion to stay and compel arbitration as to Dyna Torque.

**A. Governing Law**

■ As it did in the trial court, Helix contends here that the Federal Arbitration Act ("FAA") and the Texas Arbitration Act ("TAA") apply in this case. Dyna Torque contends that the FAA applies in this case because (1) the choice of law provision in the Master Service Agreement states that the contract shall be governed by maritime law; and (2) "the contract is a maritime transaction as contemplated by the FAA." The arbitration clause at issue does not specifically invoke either the FAA or the TAA, and the trial court did not determine which statute applies. As a threshold matter, therefore, we first determine which statute governs this case.

■ The TAA and FAA provide alternative vehicles for relief. *In re Educ. Mgmt. Corp.*, 14 S.W.3d 418, 425 (Tex. App.-Houston [14th Dist.] 2000, orig. proceeding). A trial court's order denying a motion to compel arbitration may be reviewed by interlocutory appeal when the motion is brought under the TAA. Tex. Civ. Prac. & Rem.Code Ann. § 171.098(a)(1) (Vernon 2005). When the order at issue was signed, mandamus was the appropriate vehicle to challenge an order denying arbitration under the FAA.[7] *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex.2007) (orig. proceeding) (per curiam);

---

**6.** This opinion addresses only the arbitrability of Dyna Torque's claims asserted against Helix; it does not address the arbitrability of Dyna Torque's claims against INTECSEA. In the trial court, Helix requested that Dyna Torque's claims against INTECSEA also be sent to arbitration; however, Helix has abandoned its request in this court.

**7.** Section 51.016 of the Civil Practice and Remedies Code was amended effective September 1, 2009 to allow an interlocutory appeal of an order denying a motion to compel arbitration under the FAA. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.016 (Vernon Supp. 2009). Section 51.016 does not apply here because the order at issue was signed on December 29, 2008.

*EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 91 (Tex.1996) (per curiam).

■ The FAA governs a written arbitration clause in any contract involving commerce or evidencing a maritime transaction. *See* 9 U.S.C.A. § 2 (West 2009). "Maritime transaction" means any agreement "relating to ... supplies furnished vessels." *Id.* § 1 (West 2009). The Master Service Agreement in this case evidences a maritime transaction because it relates to supplies and services Dyna Torque was to provide to furnish Helix's *Caesar* vessel. Accordingly, the FAA governs the Master Service Agreement and the issue of whether the arbitration clause contained therein applies to Dyna Torque's asserted claims.

■ If the arbitration clause is enforceable under the FAA, an analysis of enforceability under the TAA is unnecessary. *See In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 783–84 (Tex.2006); *In re Anaheim Angels Baseball Club, Inc.,* 993 S.W.2d 875, 877 n. 1 (Tex.App.-El Paso 1999, orig. proceeding [mand. denied] ). Accordingly, we first review the petition for writ of mandamus to assess enforceability of the arbitration provision under the FAA.

### B. Standard of Review

■ Mandamus is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal, as when a party is erroneously denied its contracted-for arbitration right under the FAA. *In re D. Wilson Constr. Co.,* 196 S.W.3d at 780. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *In re Nitla S.A. de C.V.,* 92 S.W.3d 419, 422 (Tex.2002) (orig. proceeding) (per curiam). "A trial court 'has no discretion in determining what the law is or applying the law to the facts.' " *In re*

*D. Wilson Constr. Co.,* 196 S.W.3d at 780 (quoting *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding)).

■ The party seeking to compel arbitration under the FAA must establish that (1) a valid arbitration agreement exists; and (2) the claims at issue fall within that agreement's scope. *In re Dillard Dep't Stores, Inc.,* 186 S.W.3d 514, 515 (Tex.2006) (orig. proceeding) (per curiam). "Generally under the FAA, state law governs whether a litigant agreed to arbitrate, and federal law governs the scope of an arbitration clause." *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130 (Tex.2005) (orig. proceeding). Because federal policy strongly favors arbitration, a presumption exists favoring agreements to arbitrate under the FAA, and any doubts about the agreement's scope are resolved in favor of arbitration. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001) (orig. proceeding).

■ Arbitration clauses are enforced under the FAA "unless it can be said with positive assurance that the clause is not susceptible of an interpretation that covers the dispute at issue." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *see also Prudential Sec., Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex.1995). If the movant establishes the existence of a valid arbitration agreement governing the dispute at issue, the burden then shifts to the opposing party to present evidence of a defense to enforcing the agreement. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex. 2003). Absent a defense to enforcing the arbitration agreement, the trial court has no discretion but to compel arbitration and stay its own proceedings. *In re J.D. Edwards World Solutions Co.,* 87 S.W.3d 546, 549 (Tex.2002) (per curiam).

## C. Existence and Scope of the Arbitration Agreement

The parties do not dispute the existence of a valid arbitration clause in the Master Service Agreement signed by Helix and Dyna Torque. Their dispute centers around whether the claims Dyna Torque asserted against Helix fall within the scope of the Master Service Agreement's arbitration clause. The arbitration clause provides that any dispute "arising under" the Master Service Agreement that is not settled by Dyna Torque and Helix must be settled under Helix's contract with its customer Murphy if the dispute affects Murphy. If the dispute does not affect Murphy, it must be arbitrated.

Helix argues that Dyna Torque's claims fall within the clause's scope based on (1) the facts and claims Dyna Torque alleged in its petition; and (2) evidence proffered below to establish that Helix's customer Murphy was not affected by the dispute between Dyna Torque and Helix. Dyna Torque contends that its claims fall outside the clause's scope because (1) Dyna Torque did not assert claims for work "given" by Helix after August 21, 2007, the date on which Helix and Dyna Torque signed the Master Service Agreement; and (2) Helix failed to establish that Helix's customer Murphy was not affected by the dispute between Dyna Torque and Helix.

 Determining whether a claim falls within an arbitration agreement's scope is a matter of contract interpretation and, thus, a question of law for the court. *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). We focus on the complaint's factual allegations, rather than the legal causes of action asserted. *Prudential Sec.,* 909 S.W.2d at 900; *In re Autotainment Partners Ltd. P'ship,* 183

S.W.3d 532, 536 (Tex.App.-Houston [14th Dist.] 2006, orig. proceeding).

 We consider whether the facts alleged are "factually intertwined" with the contract containing the arbitration clause, *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992); "inextricably enmeshed" with the contract, *Griffin v. Semperit of Am., Inc.,* 414 F.Supp. 1384, 1389 (S.D.Tex.1976); or have a "significant relationship" to the contract, *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 93 (4th Cir.1996). We also consider whether the facts alleged "touch matters" covered by the contract. *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 846 (2d Cir.1987).

### 1. Was Helix's Customer Murphy Affected by the Dispute Between Helix and Dyna Torque?

 We first address Helix's contention that Dyna Torque's claims fall within the scope of the Master Service Agreement's arbitration clause because Helix established that its customer, Murphy, was not affected by the present dispute.

The arbitration clause provides that any dispute arising under the Master Service Agreement "that is not settled by negotiation of the parties shall be settled in accordance with the provisions of Helix's Contract with its customer [Murphy] if the dispute affects the customer. In the absence of any such provisions and in cases in which the customer is not affected, any such dispute shall be settled by arbitration."

In his affidavit, Helix employee Sijthoff stated that "[n]otwithstanding Helix's dispute with Dyna Torque, Helix has been able to provide its customer, Murphy, the welding services for the Project by obtaining such services from another contractor. Thus, the present dispute between Dyna Torque and Helix does not affect Murphy."

Dyna Torque did not object to the form or substance of this statement in Sijthoff's affidavit.

Dyna Torque contends that (1) Sijthoff's affidavit "fails to refute that the dispute affects Murphy[;]" and (2) Scherfenberg and Medanic's affidavits establish that Murphy was affected by the dispute between Dyna Torque and Helix. In particular, Dyna Torque points to the following statements in Medanic's affidavit:

> The *Caesar* was slated for the upcoming Murphy Thunder Hawk, Helix' Danny and Noonan, and the BP Skarv projects. Because Dyna Torque has the expertise in the use of its automated welding system, each project to which the *Caesar* would be scheduled would have to have Dyna Torque as the welding contractor. For instance, Dyna Torque would have to develop welding procedures for each specific pipe lay during the project. During that process, the Helix welders working on the *Caesar* would be trained on the procedures for eventual qualification to work on each portion of the project.

Dyna Torque also highlights this statement in Scherfenberg's affidavit: "Because the use of the equipment and technology are essential elements of qualifying the welding procedures and because the same procedures must be used during production, the projects to which the Caesar had been slated must use Dyna Torque's equipment and technology."

Dyna Torque misplaces its reliance on these statements by Scherfenberg and Medanic because they do not support Dyna Torque's assertion that Murphy was affected by the present dispute between Dyna Torque and Helix. The highlighted statements merely assume Dyna Torque's continued participation in the Thunder Hawk project. These statements do not controvert Sijthoff's affidavit, in which he expressly states that the present dispute

did not affect Murphy. Accordingly, we conclude that Helix established its customer was not affected by the Helix—Dyna Torque dispute.

### 2. Do Dyna Torque's Claims "Arise Under" the Master Service Agreement?

■ We next address Helix's contention that Dyna Torque's claims "arise under" the Master Service Agreement and therefore are subject to the Master Service Agreement's arbitration clause.

The Master Service Agreement provides that it controls and governs "the performance of all work by . . . [Dyna Torque] for Helix and/or Helix's Customer, *given on or after [August 21, 2007]."* (emphasis added). The Master Service Agreement does not provide for the performance of any specific work for any specific price. It requires Helix to issue work orders to Dyna Torque and, upon Dyna Torque's acceptance, the work orders become part of the Master Service Agreement: "This Contract . . . together with any applicable work order which shall form a part hereof, shall control and govern all work accepted by . . . [Dyna Torque] and shall define the rights and obligations of Helix and . . . [Dyna Torque], during the term hereof. As noted above, the Master Service Agreement's arbitration clause provides that "[a]ny dispute arising under this Contract that is not settled by negotiation of the parties . . . shall be settled by arbitration."

Helix argues that the substance of Dyna Torque's pleadings and the evidence presented to the trial court establish that Dyna Torque's claims arise under the Master Service Agreement because (1) in its petition, Dyna Torque "repeatedly alleges that Dyna Torque was expecting a purchase order from Helix for the [Murphy] Project, and that Helix finally issued the purchase order on October 17, 2007" pursuant to section III of the Master Service

Agreement; (2) Dyna Torque invoiced Helix for goods and services "based on a PO that is part of the MSA[,]" and asserted claims for damages "that are explicitly based upon Helix's failure to pay those invoices[;]" and (3) the Master Service Agreement "is the only agreement that could support Dyna Torque's claims" because it contains a broad merger clause that would have absorbed any other agreements between the parties.

Dyna Torque counters that its claims against Helix do not arise under the Master Service Agreement because all of the work upon which Dyna Torque predicates its claims was given by Helix to Dyna Torque before the parties signed the Master Service Agreement on August 21, 2007. Dyna Torque contends that "none of the work forming the basis of this suit was for work subsequent to or pursuant to a written work order." Dyna Torque contends more specifically that "all of the claims and damages sought in this matter arise from work given ... to Dyna Torque prior to August 21, 2007.... Dyna Torque has not claimed that any amounts due to it arise out of the MSA because none of the work about which this matter arose were [sic] given to Dyna Torque on or after the effective date of the MSA."

Dyna Torque's appellate assertions are belied by the claims and factual allegations contained in Dyna Torque's pleadings. Further, the record before the court does not support Dyna Torque's contention that all of Dyna Torque's work was completed before the parties signed the Master Service Agreement.

**a. Dyna Torque predicated most of its claims on the Master Service Agreement and the purchase order Helix issued after the parties signed the Master Service Agreement**

In its petition, Dyna Torque asserted claims for breach of contract, promissory estoppel, breach of duty of good faith and fair dealing, a breach of duty to cooperate, fraud, tortious interference with a contract, and a claim on a sworn account. Dyna Torque expressly invoked the Master Service Agreement and Purchase Order 135392 in its petition on a majority of its asserted claims. Further, Dyna Torque based its sworn account claim specifically on four invoices Dyna Torque issued after the parties signed the Master Service Agreement and Helix issued Purchase Order 135392. Dyna Torque alleged that Helix failed to pay for goods and services provided by Dyna Torque and prayed for actual damages in an amount equal to the four invoices. In particular, Dyna Torque alleged as follows in its petition:

- With regard to its claim on a sworn account, Dyna Torque alleged that it sold Helix and INTECSEA goods and services at their request; that the prices charged were "provided according to the terms of the MSA and PO and/or, in the alternative, the usual customary and reasonable prices;" that Helix and INTECSEA accepted the goods and services; and "became bound to pay Dyna Torque its designated charges."

- With regard to its claim for breach of a "duty to cooperate," Dyna Torque alleged that "Cooperation was essential for successful performance under the verbal requests for goods and services, the MSA and PO;" that Helix and INTECSEA had a duty not to interfere with Dyna Torque's performance; and that Helix and INTECSEA breached that duty "by interfering with Dyna Torque's ability to perform under the contract." Dyna Torque asserted a claim for fraud, alleging that Helix and INTECSEA made false representations "with the intent that

Dyna Torque should act upon it [sic] by entering into the MSA and ordering, manufacturing and delivering equipment and materials, performing work listed and requested after the RFQ and affecting significant modifications to Dyna Torque's premises;" that Dyna Torque "acted in reliance on the representations by entering into the MSA, ordering equipment and materials, performing work listed and requested after the original quote;" and that Dyna Torque suffered financial loss.

- Regarding its claim for tortious interference with a contract, Dyna Torque alleged it had a valid contract with Helix BV, Helix and/or INTECSEA to provide equipment and services for consumables qualification and procedures development "through the MSA, PO, or requests for services;" that Helix BV, Helix and/or INTECSEA interfered with "one or more of these contracts;" and that this interference proximately caused Dyna Torque damages.

As evidenced by Dyna Torque's petition, Dyna Torque's claims are predicated in significant degree on the Master Service Agreement and Purchase Order 135392 issued pursuant to the Master Service Agreement. Having expressly sued on the Master Service Agreement, Dyna Torque is hard-pressed to argue now that its claims do not "arise under" the Master Service Agreement.

**b. Purchase Order 135392 confirms that Dyna Torque was "given" work after the Master Service Agreement was signed**

Dyna Torque's petition and the evidence presented below indicate that Dyna Torque (1) expected Helix to issue a purchase order approving and accepting Dyna Torque's formal quote; and (2) was "given" work when Helix issued Purchase Order 135392 on October 17, 2007—after the parties signed the Master Service Agreement on August 21, 2007. Dyna Torque had been asking Helix to issue Purchase Order 135392 since 2006. Purchase Order 135392 was the formal document by which Dyna Torque was given work under the Master Service Agreement.

The parties' dispute "arises under" the Master Service Agreement because it focuses in significant part on Purchase Order 135392 issued pursuant to the Master Service Agreement. Work performed under Purchase Order 135392 and for which Dyna Torque sued Helix is captured by the Master Service Agreement's arbitration clause. This conclusion is supported by the following excerpts from Dyna Torque's factual allegations and the evidence presented in the trial court:

- Dyna Torque submitted a formal quote to Helix in November 2006; according to Medanic's affidavit, Dyna Torque was told in April 2007 that Helix had selected Dyna Torque as its welding system contractor on Helix's upcoming Thunder Hawk project for Murphy.
- Notwithstanding this notification, Dyna Torque expected a formal acceptance of its submitted quote through a formal purchase order from Helix. Dyna Torque alleged in its petition: "Throughout late 2006 and early 2007, Helix BV continued to provide assurances that the *Caesar* would be equipped with LAWS and that a Purchase Order (hereinafter "PO") requesting services would be forthcoming."
- Dyna Torque also alleged in its petition that Helix BV visited Dyna Torque's facilities in late April 2007 "and, again, assured Dyna Torque personnel that Dyna Torque would equip the

*Caesar* .... Based on these assurances along with assurances that the PO and Initial Payment would be forthcoming, Dyna Torque began preparations to qualify procedures and participated in preparatory project meetings ... with various Helix BV, Helix Houston, and Intec personnel during May of 2007."

- Dyna Torque alleged that its "requests for the Initial Payment and issuance of the Purchase Order approving the terms of the Original Quote as well as the additional work requested ... met with increasing hostility." In August 2007, Tomon again assured "Scherfenberg that Dyna Torque would receive the Purchase Order and Initial Payment for procedures development and qualifications services."

- Dyna Torque alleged in its petition that "By mid to late October, ... Tomon attempted to rewrite history by ignoring the turnkey quote and informing Dyna Torque that he will 'pick and choose' items on Dyna Torque's quotation for approval. After reminding Mr. Tomon that Helix BV requested a turnkey, not a line item quote, Dyna Torque received a PO [135392] on October 17, 2007."

- Helix employee Sijthoff's affidavit stated that "[p]ursuant to Section III of the MSA, Helix issued Purchase Order 135392" to Dyna Torque; this purchase order "also covered facilities and services to develop and test welding procedures and supplies, and training to Helix's personnel on welding procedures."

- In its petition, Dyna Torque alleged that Helix failed to make an Initial Payment as required by Purchase Order 135392, which was based on Dyna Torque's quote and required a 50 percent payment in advance upon acceptance of the quote and issuance of the Purchase Order.[8] Thus, Dyna Torque expected Helix to make a 50 percent upfront payment for the goods and services requested, *i.e.* the work given, via Purchase Order 135392.

- When Helix did not make the Initial Payment allegedly required by Purchase Order 135392, Dyna Torque issued two invoices on October 30, 2007. Invoice # 1553 asked Helix to make a "50% Down Payment for PO# 135392" in the amount of $442,625. Invoice # 1567 contained charges for work and services provided by Dyna Torque between July 20, 2007 and October 26, 2007 in the amount of $125,144. These invoices establish that Dyna Torque did not complete all work before the parties entered into the Master Service Agreement or before Helix issued Purchase Order 135392.

- In its petition, Dyna Torque alleged that Tomon stated in a November 6, 2007 e-mail that "he 'can not agree to pay 50% of the PO value up front for any contractor or services' in direct contradiction to statements he made on August 8, 2007 and the PO that was issued October 17, 2007."

- According to Dyna Torque's petition, Tomon advised Dyna Torque "that Helix was pulling out" and instructed Dyna Torque "to cease any further work ... in direct contradiction to Dyna Torque's contract with Helix[;]" Dyna Torque issued invoice # 1617 on November 18, 2007 for services and

---

**8.** Dyna Torque alleged that the original quote and each subsequent revision of the quote "specifically stated in paragraph 5 of the Note section: 'Payment terms: 50% of procedure price in advance; balance due after delivery of qualified procedure' (hereinafter 'Initial Payment')."

equipment provided between October 26, 2007 and November 16, 2007.

- In its petition, Dyna Torque alleged that on November 19, 2007, Tomon drafted "a termination e-mail letter. Of course, it [Helix] is still not in compliance with the Master Service Contract."

- Additionally, the record contains the parties' January 4, 2008 settlement letter, which specifically links Purchase Order 135392 to the Master Service Agreement. The letter states:

*Payment on the Account and Return of all Materials*

As confirmed in your phone conversation with Ron Tomon on January 2, pursuant to Purchase Order # 135392 (the "Purchase Order") under the Master Service Contract (the "Contract") ... between Helix ... and Dyna Torque ... attached please find a check (the "Check") in the amount of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,-000.00) made payable to Dyna Torque

By execution hereof, Dyna Torque acknowledges and agrees that

1. It has received this letter and the Check

2. The Check constitutes payment on the account under the Purchase Order and the Contract....

\* \* \*

In order that Helix may make any payments which may be due and owing to Dyna Torque under the Contract, as we have previously instructed, please deliver invoices for all outstanding amounts which Dyna Torque believes it is owed, accompanied by proper supporting documentation for such amounts as required by the Contract. Any such amounts

will be partially offset by the amount represented by the Check.

Execution of this letter by Dyna Torque shall not constitute a waiver of claims for amounts which Dyna Torque believes it is owed under the Contract but which are not covered by the Purchase Order.

- As instructed in the settlement letter, Dyna Torque issued invoice # 596 for $839,545.90 on January 4, 2008. Most of the charges contained on the invoice were for services rendered and items supplied by Dyna Torque pursuant to Purchase Order 135392, with some additional charges for preparatory costs.

- Invoices # 1553 and # 596 were issued by Dyna Torque pursuant to Purchase Order 135392 and specifically reference Purchase Order 135392. November invoice # 1617 was issued by Dyna Torque for work and services it provided between October 26, 2007 and November 16, 2007—after the Master Service Agreement was signed and Purchase Order 135392 was issued.

Based on the record before us, we reject Dyna Torque's contention that "[s]ince Dyna Torque's claims arise out of goods and services given *before* Dyna Torque and Helix entered into the MSA, the MSA and, consequently, its arbitration clause does not apply in this matter." Dyna Torque's contention that all work forming the basis of the present dispute was given before the signing of the Master Service Agreement and Helix's issuance of Purchase Order 135392 pursuant to the Master Service Agreement fails in light of the factual allegations and evidence discussed above.

If all work had indeed been "given" on April 2, 2007 (the date Helix orally told Dyna Torque it selected Dyna Torque's welding system to outfit the *Caesar* for its upcoming Murphy project), or any time before the Master Service Agreement was signed, then Dyna Torque would have had

no reason to rely on Helix's assurances that a purchase order "requesting services would be forthcoming" or "imminent." There would have been no need for the parties to sign the Master Service Agreement; no need for Helix to issue Purchase Order 135392 pursuant to the Master Service Agreement requesting work based on Dyna Torque's quote; and no need for Dyna Torque to issue invoices specifically referencing Purchase Order 135392. Dyna Torque's repeated allegation that it awaited the issuance of Helix's purchase order for months underscores that the parties envisioned a formal purchase order to be the vehicle by which work would be given to Dyna Torque by Helix.

Based on the factual allegations and the evidence, we conclude that work was "given" to Dyna Torque when Helix issued Purchase Order 135392 pursuant to the Master Service Agreement. Claims based on work "given" after the parties signed the Master Service Agreement are subject to the Master Service Agreement's arbitration clause.

The factual allegations and evidence also suggest that Helix gave Dyna Torque some portion of work before the parties signed the Master Service Agreement when Helix asked Dyna Torque to "start working on the design of the welding trolleys where equipment will be installed;" obtain tensile testing; provide "monthly progress reports on the design for implementing [Dyna Torque's] equipment onto the *Caesar* [;]" and perform consumable selection welds. Thus, Dyna Torque's suit encompasses claims for work requested and provided before the parties signed the Master Service Agreement in addition to work given after the Master Service Agreement was signed. Arbitration nonetheless is mandated because on this record these claims are "factually intertwined" with the arbitrable claims. *See Prudential Sec., Inc.,* 909 S.W.2d at 900 (determining

that FAA applied to the case); *Jack B. Anglin Co.,* 842 S.W.2d at 271 (same). For the foregoing reasons, we hold that Dyna Torque's asserted claims are subject to arbitration, and that the trial court abused its discretion in denying Helix's motion to compel arbitration of Dyna Torque's claims against Helix.

**D. Stay of Litigation Pending Arbitration**

■■■■■ Helix requests that all proceedings in the trial court be stayed until the arbitration of Dyna Torque's claims against Helix is concluded. Helix argues that, once it "established that Dyna Torque's claims were subject to a valid agreement to arbitrate, the trial court had no discretion but to stay its proceedings.... This mandatory stay must include not only the claims against Helix, but also the claims against Helix's co-defendant, INTECSEA, because the claims against INTECSEA involve overlapping claims and issues." INTECSEA does not oppose staying the proceedings in the trial court. Federal law requires courts to stay litigation of claims that are subject to arbitration until arbitration is completed. 9 U.S.C.A. § 3 (West 2009); *In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d 185, 195–96 (Tex.2007) (orig. proceeding). Even when a party has brought arbitrable claims against one party and claims not subject to arbitration against another party in the same lawsuit, courts should stay all litigation. *See In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d at 195–96.

Accordingly, we conclude that the trial court abused its discretion in failing to stay Dyna Torque's litigation against Helix and INTECSEA until arbitration of Dyna Torque's claims against Helix is concluded.

**Conclusion**

We hold the trial court abused its discretion in denying Helix's motion to stay the litigation and compel arbitration of

Dyna Torque's claims against Helix. We therefore conditionally grant mandamus relief under the FAA without addressing the merits of the interlocutory appeal pursuant to the TAA; we dismiss that appeal as moot. We direct the trial court to vacate its order denying Helix's motion to stay the litigation and compel arbitration of Dyna Torque's claims against Helix, and enter a new order in accordance with this opinion. The writ will issue only if the trial court fails to act in accordance with this opinion.

Former Justice GUZMAN not participating.