**SHELL WESTERN E & P, INC. n/k/a Swepi, LP, Appellant**

v.

**PEL-STATE BULK PLANT, LLC, Appellee**

**No. 04-15-00750-CV**

Court of Appeals of Texas, San Antonio.

Delivered and Filed: October 26, 2016

S. Shawn Stephens, Amy Eikel, King & Spalding LLP, Eugene M. Nettles, Porter Hedges LLP, Houston, TX, for Appellant.

David F. Johnson, Jeffrey Charles King, Winstead PC, Fort Worth, TX, John W. Petry, Langley & Banack, Inc., Carrizo Springs, TX, Catherine M. Stone, Langley & Banack, Inc., San Antonio, TX, for Appellee.

Sitting: Karen Angelini, Justice, Marialyn Barnard, Justice, Rebeca C. Martinez, Justice

## OPINION

Opinion by: Karen Angelini, Justice

Shell Western E & P, Inc., now known as SWEPI, LP, appeals from a

$3,190,017.05 judgment against it. Pel-State Bulk Plant, LLC, sued Shell after it perfected a lien on a mineral lease owned by Shell. Both Shell and Pel-State moved for summary judgment. The trial court granted Pel-State's motion in part and denied Shell's motion. On appeal, Shell argues the trial court's summary judgment rulings are erroneous because the trial court did not construe two provisions of the Texas mineral lien statute correctly. We affirm.

## BACKGROUND

In 2010, Shell acquired a mineral lease on the Piloncillo Ranch, a 106,000-acre tract located in Dimmit, La Salle, and Webb counties in Texas. Shell hired Green Field, a general contractor, to perform fracking on wells on its mineral leases. In September 2011, Shell and Green Field signed a contract titled, "Contract for High Pressure Fracturing Services" ("the fracking agreement"). After entering into the fracking agreement with Shell, Green Field hired Pel-State, a subcontractor, to provide bulk fuel, fuel equipment, and other services to assist in developing Shell's mineral lease.

In late June 2013, Pel-State sent Shell a lien claim notice informing Shell that Green Field was not paying it for the work Pel-State had performed on the Piloncillo lease. Shortly thereafter, Pel-State filed an affidavit in the appropriate county records, perfecting a mineral lien as authorized by the Texas Property Code. Later, Shell unencumbered its leasehold interest by filing a bond for 150% of the value of the lien claims. Shell then sold its interests in the Piloncillo lease.

In July 2013, Pel-State filed suit against Shell and Green Field. Green Field filed for bankruptcy. Because Shell had filed a bond, Pel-State's remedy was to establish the validity of its lien in court and to obtain a judgment in its favor for the amount of its lien.

Pel-State and Shell filed cross-motions for summary judgment. Pel-State argued that the lien amount was $3,190,017.05 based on the invoices Green Field had failed to pay. Shell, on the other hand, argued the lien amount was only $713,700.40. Shell asserted that the amount of the lien was limited by two statutory provisions, section 56.006 and section 56.043 of the Texas Property Code. The trial court rejected Shell's construction of these statutory provisions and rendered judgment against Shell for the amount claimed by Pel-State.[1] Shell appealed.

## CHAPTER 56 OF THE TEXAS PROPERTY CODE

Chapter 56 of the Texas Property Code governs liens against mineral property. "A mineral contractor or subcontractor has a lien to secure payment for labor or services related to the mineral activities." TEX. PROP. CODE ANN. § 56.002 (West 2014). Property subject to a mineral lien includes: (1) the material, machinery, and supplies furnished or hauled by the lien claimant; (2) the land, leasehold, oil or gas well, and lease for oil and gas purposes for which the labor was performed or material, machinery, or supplies were furnished or hauled, and the buildings and appurtenances on this property; (3) other material, machinery, and supplies used for mineral activities and owned by the property owner listed in subdivision 2; and (4) other

---

1. Pel-State's summary judgment motion also asked the trial court to foreclose on its mineral lien. However, the trial court denied this part of Pel-State's motion because the lien had been discharged of record by the filing of a bond and notice as permitted by section 53.157(4) of the Texas Property Code. *See* TEX. PROP. CODE ANN. § 53.157(4) (West 2014).

wells and pipelines used in operations related to oil, gas, and minerals and located on property listed in subdivision 2. *Id.* § 56.003. To secure a mineral lien, a claimant must first serve the property owner with written notice that the lien is claimed, and then must file an affidavit with the county clerk of the county in which the property is located. *Id.* § 56.021. A claimant must enforce a mineral lien within the same time and in the same manner as a mechanic's, contractor's, or materialman's lien under Chapter 53 of the Texas Property Code. *Id.* § 56.041(a).

Under Chapter 56, a property owner who is served with a mineral subcontractor's notice may withhold payment to the contractor in the amount claimed until the debt on which the lien is based is settled or determined to not be owed. *Id.* § 56.043. In addition, Chapter 56 limits a property owner's liability in two ways. First, "[a]n owner of land or a leasehold owner may not be subjected to liability" "greater than the amount agreed to be paid in the contract for furnishing material or performing labor." *Id.* § 56.006. Second, the property owner is "not liable to the subcontractor for more than the amount that the owner owes the original contractor when the notice is received." *Id.* § 56.043.

In construing sections 56.006 and 56.043, one Texas appellate court has stated,

> [T]he lien is subordinate to the terms of the contract between the owner and his contractor. This obtains because [under section 56.006] the owner cannot be liable to the contractor for more than their contract price, [ ] and [under section 56.043] he cannot be liable to a subcontractor for more than the amount he owes his contractor at the time he is served with notice of the subcontractor's claim.

As a result, the owner is liable to a subcontractor only to the extent that he is liable to his contractor; thus, the right to the enforcement of the lien depends upon the state of the account between the owner and his contractor, and not upon the condition of the account between the contractor and his subcontractor, when the owner receives notice of the claim.

*Energy–Agri Products, Inc. v. Eisenman Chem. Co., Inc.*, 717 S.W.2d 651, 653 (Tex. App.–Amarillo 1986, no writ) (internal citations omitted).

### ISSUES PRESENTED

On appeal, Shell presents the following issues:

(1) Did the trial court err in denying Shell's cross-motion for summary judgment and in granting Pel-State's motion for summary judgment?

(2) Did the trial court erroneously interpret Texas Property Code section 56.006 by calculating Pel-State's mineral subcontractor lien using the cumulative sum of multiple contracts between Shell and Green Field, some of which were paid in full, rather than the amount of each specific contract for which Pel-State provided labor and materials?

(3) Did the trial court erroneously interpret Texas Property Code section 56.043 by not limiting Shell's liability to the amount Shell owed Green Field on the lien notice date for each specific contract on which Pel-State's claim was based?

### STANDARD OF REVIEW

■ We review a trial court's summary judgment rulings de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When reviewing a summary

judgment, we take as true all evidence favorable to the nonmovant, and we indulge every inference and resolve any doubts in the nonmovant's favor. *Id.* When both parties move for summary judgment on the same issues, and the trial court grants one party's motion and denies the other, we consider the summary judgment evidence presented by both sides, determine the questions presented, and render the judgment that the trial court should have rendered. *Id.*

### THE SUMMARY JUDGMENT MOTIONS AND EVIDENCE

In its summary judgment motion, Pel-State argued that its mineral lien applied to the full amount of Green Field's unpaid invoices, which was $3,270,017.05. According to Pel-State, on the day Shell received Pel-State's notice of lien claim, Shell owed Green Field $10,959,738.75 for labor, supplies, and services performed on the Piloncillo lease. Pel-State pointed out that after receiving its notice of lien claim, Shell did not withhold payments to Green Field as authorized under Chapter 56, but instead continued to make payments to Green Field. Finally, Pel-State argued that section 56.043 was inapplicable because the undisputed summary judgment evidence showed that when Shell received its notice of lien claim, Shell owed Green Field $10,959,738.75. In other words, the "state of the account" between Shell and Greenfield showed that Shell owed Green Field more than the amount of Pel-State's lien.

Pel-State's summary judgment evidence established that Green Field had failed to pay Pel-State invoices totaling $3,270,017.05; that after Green Field stopped paying its invoices to Pel-State, Pel-State sent a notice of lien claim to Shell; that Shell received the notice of lien claim on June 20, 2013; that on June 20, 2013, Shell owed Green Field $10,959,738.75 for labor, supplies, and services that Green Field had provided on the Piloncillo lease; that after Shell received the notice of lien claim, Shell paid Green Field a total of $36,474,917.73 for work and materials provided on the Piloncillo lease; that Pel-State perfected its mineral lien by filing an affidavit in the county records; and that Green Field ultimately made a payment to Pel-State in the amount of $80,000.00.[2] This evidence was undisputed.

In its summary judgment motion, Shell argued Pel-State's lien was "not measured by the amount Shell owed Green Field for all of the fracking services Green Field performed on the lease." Instead, Shell argued that the lien was "measured by the amount Shell owed Green Field" "for the fracking contracts under which [Pel-State] claim[ed] unpaid amounts." According to Shell, it had entered into a separate contract with Green Field for each of the eleven wells that Pel-State had serviced, and Shell had already paid Green Field everything owed on most of those contracts by the time Shell received the lien notice. Shell argued that Pel-State could only recover $713,700.40, which represented the part of Pel-State's mineral lien attributable to the contracts that were unpaid when Shell received Pel-State's lien notice. Shell maintained that both sections 56.006 and 56.043 operated to limit its liability.

### ANALYSIS

Shell presents only statutory construction arguments in this appeal. With respect to section 56.006 of the Texas Property Code, Shell argues the trial court

---

**2.** Initially, Pel-State claimed its lien was valued at $3,270,017.05; however, his amount was reduced to $3,190,017.05 because of the $80,000.00 payment Green Field made during its bankruptcy proceeding.

erred by calculating the amount of Pel-State's lien by using the cumulative sum of multiple contracts between Shell and Green Field rather than the amount of each specific contract for which Pel-State provided labor and materials. This argument is premised on Shell's assertion that it did not have a single contract with Green Field, but that it instead entered into separate contracts with Green Field and other contractors to frack each of the wells on the Piloncillo lease. Shell maintains that the trial court was required to calculate Pel-State's lien claim on a well-by-well basis.

### *One Contract or Multiple Contracts?*

As a preliminary matter, we analyze Shell's assertion that it had multiple contracts with Green Field. Shell maintains that the fracking agreement between it and Green Field was a master service agreement, and under the framework of this agreement, Shell entered into separate contracts with Green Field to frack wells on the Piloncillo lease. A master service agreement does not provide for the performance of any specific work or any specific price; instead it requires the issuance of work orders and, upon acceptance of the work orders, they become part of the master service agreement. See *In re Helix Energy Solutions Group, Inc.*, 303 S.W.3d 386, 391 (Tex. App.–Houston [14th Dist.] 2010, orig. proceeding); *Teledyne Movible Offshore, Inc. v. Leasco Fleeting & Barge Serv., Inc.*, 827 S.W.2d 633, 634–35 (Tex. App.–Beaumont 1992, writ denied).

In keeping with this theory, Shell contends that all of the well contracts were subject to standard boilerplate language contained in the fracking agreement, and Shell and Green Field later agreed to the details for the fracking procedure for each well. According to Shell, it would initiate a "call-off" by notifying Green Field that a well was drilled and ready for Green Field to frack, and then Shell would issue a completion program and provide an authorization for expenditure number for each well. After Green Field completed each stage of the fracking procedure, Green Field would generate a "Frac Field Ticket" for Shell's field representative to sign, and would later send an invoice for the total amount Shell owed on the contract. Shell contends that the contract amount for each well was reflected on the field tickets and invoices. Thus, Shell argues that the field tickets and invoices on each well "completed" a separate and independent contract for each well.

 Courts determine as a matter of law whether multiple documents comprise a single written contract when they relate to the same transaction. See *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000); *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981); see also *Halliburton Co. v. KBR, Inc.*, 446 S.W.3d 551, 564 (Tex. App.–Houston [1st Dist.] 2014, no pet.) (concluding master service agreement and tax sharing agreement had to be harmonized and construed together as one contract when the agreements were signed five days apart and were facets of the same transaction entered into for the purpose of effectuating a corporate separation). As a general rule, multiple documents pertaining to the same transaction will be construed together as one contract. *Kelley*, 614 S.W.2d at 98; see also *Board of Com'rs v. Great So. Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 809 (1951) ("It is a generally accepted rule of contracts that 'Where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together although they do not expressly refer to each other.'"); *Veal v. Thomason*, 138 Tex. 341, 159 S.W.2d 472, 475 (1942) ("It is the settled rule in this

State, as well as the rule generally, that written contracts executed in different instruments whereby a single transaction or purpose is consummated are to be taken and construed together as one contract.").

■ Shell argues that the fracking agreement was nothing more than "an agreement to agree" on future work. We disagree. The seventy-page fracking agreement between Shell and Green Field states that Shell "wishes Contractor [Green Field] to provide high pressure fracturing services and to perform the Work as specified in the Contract and/or Purchase Order(s)" and that Green Field "has the organization, expertise, and experience to provide such services and is willing and able to do so on the terms and conditions set out in this Contract." The fracking agreement has nine sections: (1) Form of Agreement; (2) Terms and Conditions; (3) Prepayments and Determination of Prices; (4) Scope of Work; (5) Administrative Procedures; (6) Health Safety Security Environment (HSSE) Requirements; (7) Performance Management; (8) Security Agreement; and (9) Guarantee Agreement. The fracking agreement calls for Green Field to provide substantive work and materials for Shell, including fracturing design/analysis; fluid and material; fluid testing/analysis; schedule of materials and cost estimate for each well; procedure for field operations; all required materials for the job; execution; and reporting. The fracking agreement also calls for Shell to provide financing to Green Field.

Under the fracking agreement, Green Field agreed to perform and complete the work, and Shell agreed to compensate Green Field in accordance with the contract provisions concerning prepayments and determination of prices or the purchase orders. The fracking agreement, which has a two-year term, repeatedly refers to itself as "the contract" and defines "contract" as "this document comprised of the [s]tated sections defined in Section 1— 'Form of Agreement,' including these 'Terms and Conditions,' and all 'Contract Variations' and all exhibits or attachments to any of the above." It defines "Contract Variation" as "any change to the [s]cope of [w]ork, delivery requirements, pricing or any other term of the Contract." It further provides that "This Contract and any subsequent Contract Variations entered into by the [p]arties set forth the entire Contract...." Thus, the fracking agreement provides that it is the contract between the parties, and encompasses any contract variations, such as changes to the scope of work or pricing. Additionally, the fracking agreement states: "If there is a conflict or contradiction between this Contract and any call-off or related purchase order, the Contract shall prevail." Nowhere does the fracking agreement state that each well is a separate contract; nor does it state that each work order or field ticket is a separate and independent contract. Finally, the record shows that Shell and Green Field amended the fracking agreement multiple times.

After reviewing the fracking agreement, its multiple amendments, the field tickets, the invoices, and the other relevant documents, we conclude that Shell and Green Field's relationship under the Piloncillo lease was governed by one contract. *See Great So. Life Ins.*, 239 S.W.2d at 809–10 (concluding multiple documents pertaining to the same transaction constituted one contract); *Halliburton*, 446 S.W.3d at 564 (construing multiple agreements that were facets of the same transaction as one contract).

### Statutory Construction

■ The construction of a statute is a question of law that we review de novo. *Atmos Energy Corp. v. City of Allen*, 353 S.W.3d 156, 160 (Tex. 2011). When con-

struing a statute, our goal is to ascertain the Legislature's intent. *Texas Adjutant General's Office v. Ngakoue*, 408 S.W.3d 350, 354 (Tex. 2013); *Atmos Energy*, 353 S.W.3d at 160. "The best guide to that determination is usually the plain language of the statute." *See Ngakoue*, 408 S.W.3d at 354. Courts are also obligated to view the statute as a whole, and endeavor to read it contextually, giving effect to every word, clause, and sentence. *Id.* Additionally, when a statute provides a definition for or uses a word or phrase in a particular manner, we must apply that definition or manner of use when interpreting the statute. *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556 (Tex. 2015). Courts may also consider the circumstances under which the statute was enacted, the object sought to be attained, and the consequences of a particular construction, regardless of whether the statute is ambiguous. *See* TEX. GOV'T CODE ANN. 311.023(1),(2),(5) (West 2013).

### 1. Section 56.006

 Shell argues the trial court erred by calculating the amount of Pel-State's lien by using the cumulative sum of multiple contracts between Shell and Green Field rather than the amount of each specific contract for which Pel-State provided labor and materials. Section 56.006 provides that a lease owner like Shell cannot "be subjected to liability under this chapter greater than the amount agreed to be paid in the *contract* for furnishing material or performing labor." (emphasis added). Shell emphasizes the use of the word "contract" in the singular, and argues that because it had multiple contracts with Green Field, the trial court erred in construing section 56.006.

 We decline to construe section 56.006 in the narrow manner advocated by Shell. As we have already determined, Shell and Green Field had a single contract. However, even if Shell and Green Field had entered into multiple contracts, the trial court did not err in construing section 56.006. The Legislature has instructed that number-specific references in statutes are not dispositive. *See* TEX. GOV'T CODE §§ 311.012(b), 312.003(b) ("[T]he singular includes the plural and the plural includes the singular ...."). Therefore, the word "contract" as used in section 56.006 is not restricted to the singular. The word "contract" also means "contracts."

Additionally, another provision of Chapter 56 assigns a particular meaning to the word "contract." Section 56.005(b) states: "[a]ll material or services that a person furnishes for the same land, leasehold interest, oil or gas pipeline, or oil or gas pipeline right-of-way are considered to be furnished under a single contract unless more than six months elapse between the dates the material or services are furnished." TEX. PROP. CODE ANN. § 56.005(b). Thus, under the guidance provided by section 56.005(b), it is presumed that materials or services furnished within a six-month period are furnished under a single contract.[3]

 Finally, the purpose of Chapter 56 is to protect laborers and materialmen. *Bandera Drilling Co., Inc. v. Lavino*, 824 S.W.2d 782, 784 (Tex. App.–Eastland 1992, no writ) (stating that Chapter 56 "is designed to protect laborers and materialmen."); *see Hayek v. Western Steel Co.*, 478 S.W.2d 786, 795 (Tex. 1972) (recognizing that the "primary object" of Chapter 56's predecessor was to "afford security and protection to laborers and materialmen."). We must construe chapter 56 to

---

**3.** In this case, Pel-State's lien claim was based on material and services furnished on the Piloncillo lease between March and June 2013, a four-month period.

effectuate this purpose. *See Hayek*, 478 S.W.2d at 795.

As we construe section 56.006, Shell could not be subjected to liability greater than the amount it agreed to pay Green Field in the contract or contracts for furnishing material or performing labor. The summary judgment evidence established that Shell contracted with Green Field to furnish material and perform labor; that Shell owed Green Field $10,959,738.75 for the labor, supplies, and services that Green Field had provided on the Piloncillo lease; and that, even after Shell received notice of Pel-State's lien claim, Shell paid Green Field a total of $36,474,917.73 for work and materials provided on the Piloncillo lease. Thus, the evidence established that the amount agreed to be paid on the contract or contracts between Shell and Green Field far exceeded $3,270,017.05, which was the amount of the lien claimed by Pel-State. Therefore, the trial court did not err in concluding that section 56.006 did not operate to limit Shell's liability.

### 2. Section 56.043

Next, Shell argues the trial court erred in construing section 56.043 by not limiting Shell's liability to the amount Shell owed Green Field on the lien notice date for each specific well on which Pel-State's claim was based. In support of this argument, Shell argues that before receiving the lien notice, it had paid Green Field in full with regard to eight of eleven wells on which Green Field had performed fracking. Shell acknowledges that it still owed Green Field on three wells, and it claims that the summary judgment evidence shows that the amount still owed on these three wells was $713,700.40. Again, Shell's argument is premised on its theory that it had a separate contract with Green Field on each well, a theory that we have already rejected.

█ Examining the plain language of the statute, we note that the word "contract" does not appear in section 56.043. Under section 56.043, a mineral lease owner like Shell is "not liable to the subcontractor for more than the amount that the owner owes the original contractor when the notice is received." *See* TEX. PROP. CODE ANN. 56.043. Thus, under section 56.043, any limitation on the amount of Pel-State's lien must be determined by the state of the account between Shell and Green Field at the time it received the lien notice, not by amounts Shell owed Green Field on particular wells. *See Energy–Agri Products*, 717 S.W.2d at 653. Shell's argument that the trial court was required to consider the status of the invoices on individual wells is not supported by the plain language of the statute.

Alternatively, Shell argues that even if the trial court correctly determined the amount of Pel-State's lien by looking at the state of the account between it and Green Field "as a whole" rather than on a well-by-well basis, Pel-State's lien was not worth $3.2 million because Green Field still owed Shell $80 million under the financing portion of the fracturing agreement. Shell asserts that the trial court's judgment should be reversed because it was entitled to a "set-off" against Pel-State's lien claim in the amount of $80 million.

█ We are not permitted to consider Shell's "set-off" argument because Shell failed to raise this issue in its response to Pel-State's summary judgment motion or in its summary judgment motion. Issues a nonmovant contends avoid the movant's entitlement to summary judgment must be expressly presented by written response to the motion and are not expressly presented by mere reference to summary judgment evidence. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d

337, 341 (Tex. 1993). "Issues not expressly presented to the trial court by written motion, answer, or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c).

The summary judgment evidence shows that when Shell received Pel-State's lien notice, Shell owed Green Field $10,959,738.75 for labor, supplies, and services that Green Field had provided on the Piloncillo lease. Because the amount of Pel-State's lien claim was $3,270,017.05, which was far less than the amount Shell owed Green Field, section 56.043 was inapplicable here. The trial court did not err in concluding that section 56.043 did not operate to limit Shell's liability.

CONCLUSION

After examining the plain language of the statute and considering the statute as a whole, we conclude the trial court did not err in construing sections 56.006 and 56.043. The trial court properly granted Pel-State's summary judgment motion in part and denied Shell's summary judgment motion. The judgment of the trial court is therefore affirmed.