# Court of Appeals
## Tenth Appellate District of Texas

10-23-00223-CV

Ogden Resources Corporation,
Appellant

v.

John Brooks and New Tech Global Ventures, LLC,
Appellees[1]

On appeal from the
272nd District Court of Brazos County, Texas
Judge John L. Brick, presiding
Trial Court Cause No. 19-000366-CV-272

CHIEF JUSTICE JOHNSON delivered the opinion of the Court.

## MEMORANDUM OPINION

In this case, we are asked to decide whether the trial court reversibly erred when it granted the motion for summary judgment filed by New Tech Global Ventures, LLC (NTGV) and John Brooks and thereby ruled that NTGV

---

[1] The style of this case in the trial court was "*Ogden Resources Corporation v. Knight Oil Tools, LLC, John Brooks, and New Tech Global Ventures, LLC.*" Accordingly, when we initially docketed this appeal in this Court, we included Knight Oil Tools, LLC, as an appellee in the style of the appeal. As the appeal progressed, however, we discovered that Knight Oil Tools, LLC, is not, in fact, a party to this appeal. *See* TEX. R. APP. P. 3.1(c) ("*Appellee* means a party adverse to an appellant."). Thus, we have removed Knight Oil Tools, LLC, from the style of this appeal.

and Brooks were entitled to the benefits of allocation-of-risk provisions contained in a "Master Service Agreement" (MSA). We conclude that the trial court did err in granting the summary-judgment motion; therefore, we reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion.

## Background

This case involves experienced, sophisticated oil and gas businessmen. As pleaded in its seventh amended petition, Ogden Resources Corporation (Ogden Resources) and several investors own the Stasny-Krog Unit, Well #1 in Brazos County. Ogden Resources is the operator of the well under the terms of a joint operating agreement with the other investors.

As operator, it was Ogden Resources' responsibility, in addition to other duties, to hire various companies and individuals to perform a variety of functions in connection with the drilling of the Stasny-Krog Unit, Well #1. Knight Oil Tools, LLC (Knight Oil) was one of those companies. Ogden Resources engaged Knight Oil to supply tubing and other equipment to be used in the drilling of the Stasny-Krog Unit, Well #1.

Another of the companies that worked on the Stasny-Krog Unit, Well #1 was NTGV. In its seventh amended petition, Ogden Resources stated that it hired NTGV to provide engineering and consulting services as well as an onsite consultant, or "company man," during the drilling of the Stasny-Krog Unit,

Well #1.  A "company man" acts as the owner's representative to ensure proper drilling of the well.  Ultimately, NTGV assigned Brooks to handle this task.

Drilling of the Stasny-Krog Unit, Well #1 commenced.  In its seventh amended petition, Ogden Resources alleged, however, that Knight Oil, NTGV, and Brooks breached various duties that they owed to Ogden Resources and that those breaches caused downhole damage to such an extent that the Stasny-Krog Unit, Well #1 was lost.

Ogden Resources sued Knight Oil and Brooks for damages that Ogden Resources allegedly sustained in connection with the loss of the well.  Ogden Resources also filed suit against NTGV.  By agreement between Ogden Resources and NTGV, Ogden Resources' claims against NTGV were consolidated into the lawsuit brought by Ogden Resources against Knight Oil and Brooks, *i.e.*, the lawsuit underlying this appeal.  After the trial court consolidated the lawsuits, Ogden Resources nonsuited Knight Oil, and the trial court entered an order in which it dismissed, with prejudice, all Ogden Resources' claims against Knight Oil.

Meanwhile, NTGV and Brooks answered Ogden Resources' pleadings by generally denying Ogden Resources' allegations and asserting the affirmative defense of release.  NTGV and Brooks also brought counterclaims against Ogden Resources for breach of contract and declaratory relief based on the MSA.

Basically, an MSA is designed to define the relationship between a recurring purchaser and user of goods and services and a seller or supplier of those goods and services without the need to redefine the relationship between them with each subsequent, separate transaction. The typical MSA contains general terms that will govern any subsequent project or transaction when triggered by a subsequently issued and accepted purchase order, work order, or other request. *Shell W. E & P, Inc. v. Pel-State Bulk Plant, LLC*, 509 S.W.3d 581, 587 (Tex. App.—San Antonio 2016, no pet.). When triggered, the terms of the work orders become part of the MSA. *Id.*

Furthermore, it is not unusual in the oil and gas industry for the parties to an MSA to allocate among themselves the risks involved in a project. *See Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 168 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

The MSA in this case was executed on August 24, 2003, by Stephen E. Ogden, as president of Ogden Resources, and by Larry Cress, as president of New Tech Engineering, LP (NTE). NTGV's and Brooks's pleadings allege that the MSA has never been terminated and that there has never been a subsequent MSA executed by the parties.

The MSA states that it was "made and entered into" by and between Ogden Resources, designated as "Company," and NTE "on behalf of itself and all its direct and indirect wholly-owned subsidiaries and affiliates (collectively

'Contractor').'' The parties to the MSA further defined "Company Group" in the MSA to "include Company, its parent(s), subsidiaries, and affiliated companies, and its and their partners, joint venturers, non-operating working interest owners, co-lessees, contractors and subcontractors, (except Contractor), and the owners, shareholders, directors, officers, employees, agents, representatives, invitees, and underwriters of all the foregoing, and their heirs, legal representatives, successors and assigns." The parties also defined "Contractor Group" in the MSA to "include Contractor, its parent(s), subsidiaries, and affiliated companies, and its and their subcontractors, and the owners, shareholders, directors, officers, employees, agents, representatives, invitees, and underwriters of all the foregoing, and their heirs, legal representatives, successors and assigns."

Paragraph 3 of the MSA then contains the provisions regarding the scope of the agreement. Paragraph 3(b) specifically provides:

> At any time and from time to time during the term of this Agreement, when Company desires Work to be performed by Contractor, a Company Representative (as defined below) shall give Contractor a request for such Work. The request may be in the form of a work order, purchase order, letter, memorandum, or other document, or may be verbal ("Work Request"). If and when there is agreement between Company and Contractor regarding the specific terms of the Work Request, Contractor shall thereafter commence the performance of the Work in accordance with the terms and conditions of the Work Request and this Agreement. Commencement of the Work by Contractor shall be deemed to be an acceptance of the terms and conditions of the Work Request that do not conflict with the terms of this Agreement.

Paragraph 3(e) of the MSA further provides in pertinent part: "Any and all Work performed by Contractor for Company after the Effective Date of this Agreement, whether under verbal or written instructions, shall be deemed to be performed pursuant to the terms and conditions of this Agreement."

The MSA additionally contains, among many other things, provisions for the allocation of risks. The portion of the MSA in which the parties to the agreement addressed the allocation of risks is Paragraph 7(c), bearing the heading "INDEMNITY-DEFENSE." Paragraph 7(c)(1) includes the following "INTRODUCTION" to this portion of the agreement:

> Company and Contractor recognize that in connection with the services, operations, and the provision of goods, equipment and facilities contemplated by this Agreement, there is some risk that accidents and events may occur in which property is lost, damaged or destroyed and/or in which persons may be killed or injured. The parties desire to allocate these risks between them and to require that these risks be adequately insured so as to minimize the possibility of disputes and to engage in effective risk management. For these reasons, the parties agree to the indemnities and defense obligations set forth below.

Paragraph 7(c)(2) of the MSA follows, setting out the specific allocation-of-risk provisions. The specific provisions are set out in uppercase and bold type and are underlined in the original.

Paragraph 7(c)(2)(b) of the MSA provides for "**COMPANY'S INDEMNITY OBLIGATIONS.**" The parties to the MSA have handwritten

and initialed the phrase—"To the extent permitted by Company's Insurance"—

at the beginning of the paragraph, followed by:

**COMPANY SHALL DEFEND, INDEMNIFY, HOLD HARMLESS, AND RELEASE CONTRACTOR GROUP FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, DAMAGES, DEMANDS, CAUSES OF ACTION, SUITS, JUDGMENTS AND LIABILITIES OF EVERY KIND (INCLUDING ALL EXPENSES OF LITIGATION, COURT COSTS AND ATTORNEYS' FEES) BROUGHT OR ASSERTED AGAINST CONTRACTOR GROUP BY ANY PARTY WHOMSOEVER ARISING OUT OF OR RELATED TO THIS AGREEMENT AND RESULTING FROM ANY CLAIM OF LOSS, DAMAGE, INJURY, ILLNESS OR DEATH DESCRIBED IN SUBPARAGRAPHS (i) THROUGH (viii) BELOW,[2] REGARDLESS (EXCEPT AS EXPRESSLY PROVIDED HEREIN) OF WHO MAY BE AT FAULT OR OTHERWISE RESPONSIBLE UNDER ANY OTHER CONTRACT, OR ANY STATUTE, RULE OR THEORY OF LAW, INCLUDING BUT NOT LIMITED TO THEORIES OF STRICT LIABILITY, AND EVEN THOUGH THE SUBJECT LOSS, DAMAGE, INJURY, ILLNESS OR DEATH MAY HAVE BEEN CAUSED IN WHOLE OR IN PART BY: (1) THE SOLE, CONCURRENT, ACTIVE OR PASSIVE NEGLIGENCE OF CONTRACTOR GROUP OR A THIRD PARTY OR (2) A DEFECT IN THE PROPERTY OR EQUIPMENT OF EITHER PARTY PROVIDED BY OR ON BEHALF OF EITHER PARTY, INCLUDING BUT NOT LIMITED TO THOSE DEFECTS PRE-EXISTING THE EFFECTIVE DATE OF THIS AGREEMENT.**

The MSA contains a similar provision applicable to "**CONTRACTOR'S INDEMNITY OBLIGATIONS**" in Paragraph 7(c)(2)(a).

---

[2] We need not specifically discuss Subparagraphs (i) through (viii) in this opinion; however, we note that Subparagraph (vi) expressly provides: "**RESERVOIR DAMAGE, LOSS OR HOLE, COSTS AND EXPENSES IN BRINGING THE WELL UNDER CONTROL**."

Finally, Paragraph 22 of the MSA includes several miscellaneous provisions. As relevant here, Paragraph 22(f) provides: "<u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns."

NTGV and Brooks alleged in their pleadings that they provided their services to Ogden Resources in connection with the drilling of the Stasny-Krog Unit, Well #1 pursuant to the MSA. NTGV and Brooks further asserted that, under the MSA, Ogden Resources had explicitly agreed to "defend, indemnify, hold harmless, and release" NTGV and its subcontractors, including Brooks, from all claims for damages relating to Ogden Resources' property, including damage to the Stasny-Krog Unit, Well #1. NTGV and Brooks accordingly asserted as an affirmative defense that Ogden Resources had "expressly agreed to defend, indemnify, hold harmless, and release [NTGV and Brooks] from and against all claims brought by [Ogden Resources] and/or for any claims(s) [*sic*] brought by any party whomsoever for any injury to [Ogden Resources], including the damages it seeks herein." Additionally, NTGV and Brooks brought a counterclaim for breach of contract against Ogden Resources, alleging that Ogden Resources breached the MSA by asserting claims against them "for damages that fall squarely within the plain language of the MSA's defense, indemnity, release and hold harmless requirements." Finally, NTGV and Brooks sought declaratory relief as follows:

a.  [A declaration t]hat the MSA is a valid and enforceable contract between [NTGV] and Ogden [Resources].

b.  A declaration that Ogden [Resources] shall release [NTGV] from the Lawsuit pursuant to the MSA.

c.  A declaration that Ogden [Resources] shall release Brooks from the Lawsuit pursuant to the MSA.

d.  A declaration that Ogden [Resources] owes [NTGV] reimbursement of all costs and expenses, including reasonable attorney's fees, incurred in defending the Lawsuit.

e.  A declaration that Ogden [Resources] owes Brooks reimbursement of all costs and expenses, including reasonable attorney's fees, incurred in defending the Lawsuit.

f.  A declaration that Ogden owes [NTGV] all costs and expenses, including reasonable attorney's fees, incurred in pursuing its claim for indemnity against Ogden [Resources].

NTGV and Brooks filed a motion for summary judgment and later amended it. NTGV and Brooks moved for traditional summary judgment on their affirmative defense of release and on their counterclaims for breach of contract and declaratory judgment. On April 20, 2020, the trial court entered an order denying NTGV's and Brooks's motion.

NTGV and Brooks thereafter filed a motion to reconsider their motion for summary judgment. On October 26, 2021, the trial court granted NTGV's and Brooks's motion for summary judgment. The order provides that it is "ORDERED, ADJUDGED, AND DECREED that [NTGV]'s and Brooks' Motion

for Summary Judgment is granted in its entirety." The order further provides that it is "ORDERED, ADJUDGED, AND DECREED that all claims and causes of action by Plaintiff Ogden [Resources] against [NTGV] and Brooks are hereby DISMISSED WITH PREJUDICE."

Ogden Resources subsequently asked the trial court to reconsider its ruling on the motion for summary judgment; the trial court declined. On July 24, 2023, after a bench trial, and after the trial court had corrected a minor error in its initial May 8, 2023 judgment,[3] the trial court entered a final judgment in which it awarded attorney's fees of $767,129.00 and court costs and expenses of $94,160.77 to NTGV and Brooks. In the judgment, the trial court also granted the declaratory relief sought by NTGV and Brooks.

This appeal followed. In five issues, Ogden Resources challenges the trial court's granting of NTGV's and Brooks's motion for summary judgment.

## Standard of Review

We review a trial court's grant of summary judgment *de novo*. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 837 (Tex. 2018); *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018).

To prevail under the traditional summary-judgment standard, the movant has the burden to establish that there is no genuine issue of material

---

[3] After the trial court had signed its initial May 8, 2023 judgment, Ogden Resources had timely filed motions extending the trial court's plenary power. *See* TEX. R. CIV. P. 329b.

fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c), 50 Tex. B.J. 857 (Tex. 1987, amended 2026)[4]; *ConocoPhillips Co.*, 547 S.W.3d at 865. Accordingly, for a trial court to grant a defendant's traditional motion for summary judgment on an affirmative defense, the defendant must conclusively establish each element of the affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997); *see Draughon v. Johnson*, 631 S.W.3d 81, 87–88 (Tex. 2021). Likewise, for a trial court to grant a defendant's traditional motion for summary judgment on a counterclaim, the defendant must conclusively establish each element of that counterclaim. *Almance v. Shipley Bros., Inc.*, 247 S.W.3d 252, 255 (Tex. App.—El Paso 2007, no pet.); *Rabe v. Dillard's, Inc.*, 214 S.W.3d 767, 768 (Tex. App.—Dallas 2007, no pet.). The plaintiff has no burden to respond to a traditional motion for summary judgment on a defendant's affirmative defense or counterclaim unless the defendant conclusively establishes the affirmative defense or counterclaim. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam). In such cases, only if the defendant meets its summary-judgment burden does the burden shift to the plaintiff to disprove or

---

[4] The Texas Supreme Court recently amended Rule of Civil Procedure 166a. The amendments apply only to motions for summary judgment filed on or after March 1, 2026. *See* Final Approval of Amendments to Rule 166a of the Texas Rules of Civil Procedure, Misc. Docket No. 26-9012 (Tex. Feb. 27, 2026). Therefore, the amendments do not apply in this case. Then again, although the amendments resulted in the renumbering of the paragraphs of the rule, the "rewrite [wa]s not intended to substantively change the law," other than the deadline changes. TEX. R. CIV. P. 166a cmt.

raise an issue of fact that would preclude the grant of summary judgment. *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014).

To determine if a genuine issue of material fact exists, we review the evidence in the light most favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019). We credit favorable inferences to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not. *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The evidence raises a genuine issue of material fact if reasonable and fair-minded jurors could differ in their conclusions in light of all the summary-judgment evidence presented. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam).

## Discussion

In its first three issues, Ogden Resources contends that the trial court erred in granting NTGV's and Brooks's motion for summary judgment because NTGV and Brooks did not prove that "the MSA controlled the relationship [between] the parties with respect to the drilling of the Stasny-Krog [Unit,

Well] #1." We need address only issues one and two because they are dispositive of this appeal. *See* TEX. R. APP. P. 47.1.

NTGV and Brooks argued in their motion for summary judgment that NTGV was entitled to the protection of the MSA in two different capacities: (1) as a successor to NTE and (2) as an affiliate of NTE. NTGV and Brooks claimed that Brooks was then entitled to the protection of the MSA as NTGV's subcontractor.

To support their motion for summary judgment, NTGV and Brooks attached the MSA itself as summary-judgment evidence. As stated above, Paragraph 22(f) of the MSA provides: "<u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns." Additionally, as stated above, the MSA provides that it was "made and entered into" by and between Ogden Resources, designated as "Company," and NTE "on behalf of itself and all its direct and indirect wholly-owned subsidiaries and affiliates (collectively 'Contractor')."

Accordingly, if NTGV was a "successor" or an "affiliate" of NTE under the MSA, then NTGV was entitled to the benefits of the MSA. In its first and second issues, however, Ogden Resources contends that NTGV and Brooks

presented no summary-judgment evidence that NTGV was a "successor" or an "affiliate" of NTE under the MSA.[5]

The interpretation of an unambiguous contract is a question of law for the court. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). Neither the term "successor" nor the term "affiliate" is defined in the MSA. Absent such definitions, we look to the plain, ordinary, and generally accepted meaning of the terms unless the MSA shows that the parties used the terms in a technical or different sense. *See Murphy Expl. & Prod. Co.—USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018).

The most recent edition of Black's Law Dictionary states that a "successor" is "[s]omeone who succeeds to the office, rights, responsibilities, or place of another," "one who replaces or follows a predecessor," or "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Successor*, BLACK'S LAW DICTIONARY (12th ed. 2024).

---

[5] In its second issue, Ogden Resources more precisely asserts that NTGV and Brooks presented no summary-judgment evidence that NTGV was a "subsidiary or affiliate" of NTE. However, in their motion for summary judgment, NTGV and Brooks only raised the arguments that NTGV was entitled to the protection of the MSA in its capacities as a successor to NTE and as an affiliate of NTE. Therefore, we limit our analysis regarding Ogden Resources' second issue to whether NTGV and Brooks conclusively established that NTGV was an "affiliate" of NTE under the MSA. *See Lee v. Lee*, 43 S.W.3d 636, 640 (Tex. App.—Fort Worth 2001, no pet.) (citing *Stiles v. Resol. Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993)) ("This court can affirm a summary judgment only upon the grounds raised in the motion for summary judgment."); *see also* TEX. R. CIV. P. 166a(c), 50 Tex. B.J. 857 (Tex. 1987, amended 2026).

The Business Organizations Code defines "affiliate" as "a person who controls, is controlled by, or is under common control with another person." TEX. BUS. ORGS. CODE ANN. § 1.002(1). A "person" is defined in the Business Organizations Code as "an individual *or* a corporation, partnership, limited liability company, business trust, trust, association, or other organization, estate, government or government subdivision or agency, or other legal entity, or a protected series or registered series of a domestic limited liability company or foreign entity." *Id.* § 1.002(69-b) (emphasis added). The most recent edition of Black's Law Dictionary contains a similar definition of "affiliate": "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, BLACK'S LAW DICTIONARY (12th ed. 2024).

In addition to the MSA itself, NTGV and Brooks provided Cress's affidavit as summary-judgment evidence. In his affidavit, Cress stated:

> 1. "My name is Larry Cress. I am of sound mind, capable of making this affidavit and personally acquainted with the facts herein stated. Everything in this affidavit is true and correct.
>
> 2. I am President and Chief Executive Officer of New Tech Engineering, LP ("NTE") and New Tech Global Ventures, LLC ("NTGV"). NTGV is a successor company to NTE that was created in 2009.
>
> 3. All work performed for Ogden by NTE and subsequently NTGV was done pursuant to a Master Service Agreement (the "MSA"). A true and correct copy of the MSA is

attached hereto and incorporated as Exhibit A. I executed the MSA on behalf of NTE.

4. The MSA was binding on and benefited all NTE successors and assigns, including NTGV, and states that "[t]his Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns."

5. The MSA has never been terminated by either NTE, NTGV or Ogden and there has never been another MSA executed between NTE, NTGV and Ogden.

6. Pursuant to the MSA, Ogden requested NTGV to provide it with consulting engineering and project management services as well as providing wellsite supervision services through independent consultants, Tracy Lisman and John Brooks, during the drilling of one of Ogden's wells, the Stasny-Krog Unit, Well #1.

Ogden Resources argues that the only statement in Cress's affidavit that supports that NTGV had some relationship with the MSA is Cress's assertion that NTGV is one of NTE's "successors" or is a "successor company" to NTE. Ogden Resources further contends that Cress's statement is conclusory and was therefore insufficient to establish that NTGV was a "successor" or "affiliate" of NTE under the MSA. We agree.

"A summary judgment may be based on uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c), 50 Tex. B.J. 857 (Tex. 1987, amended 2026). Conclusory statements in affidavits are not sufficient to

support a summary judgment because they are not credible or susceptible to being readily controverted. *See Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam); *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991) (per curiam). A conclusory statement is one that does not provide the underlying facts to support the conclusion. *Choctaw Props., L.L.C. v. Aledo I.S.D.*, 127 S.W.3d 235, 242 (Tex. App.—Waco 2003, no pet.).

Here, in his affidavit, Cress labeled NTGV as NTE's successor—an identical term to that used by the parties in the MSA. But, as stated above, the MSA does not define the term "successor." Nor did Cress provide a definition of the word in his affidavit. Moreover, in his affidavit, Cress provided no underlying facts—facts that could have been readily controverted—from which one could determine what he meant in using the word "successor" in his affidavit. Accordingly, we conclude that Cress's assertion in his affidavit that NTGV is one of NTE's "successors" or is a "successor company" to NTE is conclusory. *See id.* Cress's statement was therefore insufficient to conclusively establish that NTGV was a "successor" or an "affiliate" of NTE under the MSA. *See Ryland Grp., Inc.*, 924 S.W.2d at 122; *Anderson*, 808 S.W.2d at 55; *see also* TEX. R. CIV. P. 166a(c), 50 Tex. B.J. 857 (Tex. 1987, amended 2026).

NTGV and Brooks nevertheless contend in their brief that Cress's statement is not conclusory because "[a] witness's personal knowledge may

itself provide the necessary factual support to ensure that her statements in an affidavit are not conclusory." NTGV and Brooks point out that Cress stated in his affidavit that he executed the MSA on behalf of NTE and that he is the president and CEO of both NTGV and NTE. NTGV and Brooks then argue that "[i]f anyone would know whether NTGV is NTE's successor, it would be NTGV's and NTE's president and CEO." NTGV and Brooks contend that Cress's assertion that NTGV is NTE's successor was therefore simply a statement of fact.

We, however, disagree and believe the cases on which NTGV and Brooks rely to support their argument are distinguishable from the present case. For instance, NTGV and Brooks cite *Alicea v. Curie Building, L.L.C.*, 632 S.W.3d 142 (Tex. App.—El Paso 2021, no pet.). In *Alicea*, the summary-judgment evidence included the affidavit of an accountant who had assisted various entities involved in a business transaction. *Id.* at 147. In his affidavit, the accountant labeled the business transaction as a reorganization rather than a sale. *Id.* The appellant complained that such a characterization by the accountant was conclusory. *Id.* at 149. But the *Alicea* court disagreed. *See id.* at 149–50. The *Alicea* court noted that, in his affidavit, the accountant had provided "an extensive discussion of facts explaining the steps of the [t]ransaction." *Id.* at 149. The *Alicea* court further discussed that the accountant had provided his definition of the term "reorganization." *Id.* The

*Alicea* court was therefore able to analyze how close the accountant's definition of the term was to the plain, ordinary, and generally accepted meaning of the term. *See id.* at 149–50. Conversely, in the present case, Cress provided no definition or underlying facts to show what he meant when he used the word "successor" in his affidavit.

NTGV and Brooks also cite *La China v. Woodlands Operating Co.*, 417 S.W.3d 516 (Tex. App.—Houston [14th Dist.] 2013, no pet.), to support their argument that Cress's statement is not conclusory. In *La China*, the summary-judgment evidence included the affidavit of the vice president/general counsel of one of the original defendants in the suit. *Id.* at 519. In her affidavit, the vice president/general counsel stated that the original defendants were not the owners, lessors, lessees, or managers of the waterpark where the plaintiff was injured, nor the employers of anyone working there. *Id.* The plaintiff/appellant argued that the vice president/general counsel's affidavit was conclusory. *Id.* at 519–20. But the *La China* court determined that the statements in the affidavit were not conclusory. *Id.* at 520. The *La China* court reasoned that the statements in the affidavit furnished some factual information that could have been rebutted and, therefore, that they contained enough underlying facts to support the award of summary judgment. *Id.* The *La China* court further noted that ownership of the waterpark was not a contested issue in the case. *Id.* at 521. The original defendants were showing

that they did not own, lease, or manage the waterpark, or employ anyone working at the waterpark, to prove that they did not owe a duty to the plaintiff. *Id.*

In the present case, however, to be entitled to summary judgment based on their motion, NTGV and Brooks needed to establish NTGV's entitlement to the protection of the MSA by establishing that NTGV was a "successor" or an "affiliate" of NTE within the meaning of the MSA. NTGV and Brooks did not attempt to do so by furnishing any factual information that could have been rebutted. Rather, NTGV and Brooks provided Cress's bald statement in his affidavit labelling NTGV as NTE's successor. As explained above, Cress's statement is therefore conclusory. *See Choctaw Props., L.L.C.*, 127 S.W.3d at 242.

Lastly, we will discuss *Ortega v. CACH, LLC*, 396 S.W.3d 622 (Tex. App.—Houston [14th Dist.] 2013, no pet.), which NTGV and Brooks also cite to support their argument that Cress's statement is not conclusory. In *Ortega*, a bank officer asserted in her affidavit that the defendant's account had been "sold, transferred and set over" to the plaintiff on a certain date. *Id.* at 627–28. The defendant/appellant argued that the bank officer's affidavit was conclusory. *Id.* at 627. The *Ortega* court determined, however, that the bank officer's statement in her affidavit was not conclusory. *Id* at 628. The *Ortega* court reasoned that the bank officer could testify to her personal knowledge of

the fact that the account had been transferred to the plaintiff even though she did not provide any supporting documentary evidence of the transfer. *Id.*

In the present case, however, our concern with Cress's statement is not that there is no documentary evidence to support it. Rather, as discussed above, Cress's statement is conclusory because it was not supported by any underlying facts from which one could determine what Cress meant in using the word "successor." *See Choctaw Props., L.L.C.*, 127 S.W.3d at 242. Accordingly, as explained above, Cress's statement was insufficient to conclusively establish that NTGV was a "successor" or an "affiliate" of NTE under the MSA. *See Ryland Grp., Inc.*, 924 S.W.2d at 122; *Anderson*, 808 S.W.2d at 55; *see also* TEX. R. CIV. P. 166a(c), 50 Tex. B.J. 857 (Tex. 1987, amended 2026).

NTGV and Brooks additionally contend in their brief that even if Cress's statement that NTGV is NTE's successor is conclusory and, therefore, insufficient to support the trial court's granting of summary judgment, Cress's other statements in his affidavit—that he signed the MSA as the president of NTE, that NTE is still in existence, and that Cress is the president and CEO of both NTE and NTGV—along with Ogden Resources' own summary-judgment evidence, conclusively established that NTGV was NTE's "affiliate" under the MSA. But NTGV and Brooks acknowledge in their brief that the deposition testimony presented by Ogden Resources was, in fact, offered into

the record *after* the trial court had already granted summary judgment in NTGV's and Brooks's favor. Furthermore, as explained below, Cress's other statements in his affidavit were insufficient to conclusively establish that NTGV was NTE's "affiliate" under the MSA. *See* TEX. R. CIV. P. 166a(c), 50 Tex. B.J. 857 (Tex. 1987, amended 2026).

Citing *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80 (Tex. App.—Houston [1st Dist.] 2004, no pet.), NTGV and Brooks argue in their brief that "two or more entities are affiliates simply as long as they are 'related' to each other as part of the same family of companies." But *Eckland Consultants*, in fact, defines the term "affiliate" similarly to how we have above. *See id.* at 88. The *Eckland Consultants* court specifically stated:

> ["Affiliate"] is generally defined as a "corporation that is related to another corporation by shareholdings or other means of control," BLACK'S LAW DICTIONARY 59 (7th ed. 1999), and as a "company effectively controlled by another or associated with others under common ownership or control." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 35 (1971).

*Eckland Consultants, Inc.*, 176 S.W.3d at 88.

Here, we believe that Cress's very limited statements in his affidavit about the relationship between NTE and NTGV were insufficient to conclusively establish that the companies were related by common ownership or control. Accordingly, Cress's statements were insufficient to conclusively establish that NTGV was NTE's "affiliate" under the MSA. *See id.*; *see also*

TEX. BUS. ORGS. CODE ANN. § 1.002(1), (69-b); *Affiliate*, BLACK'S LAW DICTIONARY (12th ed. 2024).

In light of the foregoing, we conclude that NTGV and Brooks did not establish their entitlement to summary judgment on their motion. *See* TEX. R. CIV. P. 166a(c), 50 Tex. B.J. 857 (Tex. 1987, amended 2026). We sustain Ogden Resources' first and second issues.[6] And having sustained its first and second issues, we need not reach Ogden Resources' third, fourth, and fifth issues. *See* TEX. R. APP. P. 47.1.

## Conclusion

In light of the foregoing, we reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion.



MATT JOHNSON
Chief Justice

OPINION DELIVERED and FILED: April 2, 2026

Before Chief Justice Johnson,
        Senior Justice Davis,[7] and
        Senior Justice Gabriel[8]

---

[6] We need not reach Ogden Resources' argument in its second issue that NTGV must have been a wholly-owned subsidiary or affiliate of NTE when the MSA was signed.

[7] The Honorable Rex Davis, Senior Justice (Retired) of the Tenth Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Texas.

[8] The Honorable Lee Gabriel, Senior Justice (Retired) of the Second Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Texas.

Reversed and remanded
CV06